## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| ERICA KELLY and MARILYN PAONE, individually and on behalf of all others similarly situated, <br><br>                   Plaintiffs, <br><br>    v. <br><br> WALT DISNEY PARKS AND RESORTS U.S., INC., <br><br>               Defendant. | Case No: 6:22-cv-1919-RBD-DCI |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Erica Kelly and Marilyn Paone were holders of Platinum Pass annual passes to the Walt Disney World (WDW) theme parks when the once-in-a-century pandemic closed the parks in March 2020.  At the time, Walt Disney Parks and Resorts U.S., Inc. (WDPR), like so many other businesses, had to rapidly adapt its operations to a new world, in a way that was both safe for its guests and its cast members and consistent with an ever-evolving set of COVID restrictions and recommendations: social distancing, personal protective equipment, and more. WDPR determined that managing guest density and traffic would be critical for safety and guest experience in this unprecedented context, so WDPR implemented a reservation system that required guests to register ahead of time.

The reservation system naturally required more administration and oversight than in an unconstrained, pre-COVID environment—for example, without the proper safeguards, day ticket holders could occupy all reservations at

the park and make it impossible for annual passholders to attend, or vice versa. WDPR addressed these possibilities by setting aside separate reservation allocations for the groups, using the historical visitation rate of annual passholders to determine the number of available passholder-specific reservations on any given day. WDPR repeatedly notified passholders of the new reservation system prior to its rollout, gave passholders a chance to experience the system—one month, free of charge—and permitted passholders to opt out and receive a pro rata refund should they not wish to continue as passholders after experiencing the new safety measures. Plaintiffs chose not to opt out. They kept and then renewed their passes, and used them to visit WDW nearly *two hundred times* combined under the reservation system during the putative class period.

Plaintiffs then filed this lawsuit in late 2022 claiming the reservation system breached implied or express contract terms and Florida unfair trade practices law by imposing "blockout dates" on Platinum Passes. Discovery has proved that WDW did no such thing—under the reservation system thousands of Platinum Pass holders visited WDW using their passes *every day the parks were open*. WDPR is entitled to summary judgment on each of Plaintiffs' claims.

## UNDISPUTED FACTS

### A.     WDW Annual Passes

As of March 2020, WDPR offered WDW annual passes that included the Platinum Pass, the Gold Pass, and the Silver Pass. ECF No. 85-1 at -1385. Platinum Passes had no blockout dates, so were eligible to access the parks on any day that

the parks were open.  Ex. 1 at 102:25-103:1; 104:2-9.[1]  The Gold Pass and Silver Pass had blockout dates—dates they were *ineligible* to access the parks.  *See id.* at 103:5-13; 193:3-6.  Gold Passes, for example, had around 30 blockout dates per year, so no Gold Pass could be used to visit on those dates.  *See* ECF No. 85-5.

The annual passes are governed by terms and conditions, which provide that "[p]arks … may change operating hours; close due to refurbishing, capacity, low demand, weather … or other reasons; and may otherwise change or be discontinued without notice and without liability" to WDPR.  ECF No. 85-2 at -1446.  They also provide that terms and conditions "are subject to change."  *Id.*  WDPR's websites similarly explained that pass entitlements are "subject to change without notice."  ECF No. 50-10 at 2, 4.  Passholders had to review and agree to these terms to purchase their passes.  *See* Ex. 1 at 63:5-9, 238:18-239:8.

## B.    The Reservation System

As a result of the COVID-19 pandemic, WDW was forced to close in March 2020.  Ex. 2 at Interrogatory 14.  WDW began to reopen in July 2020.  ECF No. 85-3 at -0276.  Ahead of this reopening, on May 29, 2020, WDPR communicated to passholders that admission would be subject to a new reservation system under which both a valid form of admission (annual pass or daily ticket) and a reservation would be required.  ECF No. 85-4 at -0272; *see also* ECF No. 85-3 at -0276.  WDPR

---

[1] All references to Exhibits ("Ex.") herein are to the exhibits to the Declaration of Ryan Chabot in Support of Walt Disney Park and Resorts U.S., Inc.'s Motion for Summary Judgment.  Pursuant to the Court's Case Management and Scheduling Order Section III.D, citations to documents already part of the record are provided by pinpoint citations to the docket and page numbers for such filing.  *See* ECF No. 41 (Dec. 16, 2022) at Section III.D.

explained that "reservations [were] limited in capacity, subject to availability and [were] not guaranteed."  ECF No. 85-3 at -0276.  This system was designed to put "limits on attendance and density controls that align with expert guidance," in order to safely and enjoyably reopen during an unprecedented pandemic.  ECF No. 85-4 at -0272; *see, e.g.*, Ex. 1 at 68:12-15, 186:17-19.  WDPR provided multiple, clear notices of the reservation system.  *See, e.g.*, ECF No. 85-4 at -0272; ECF No. 85-3 at -0275; ECF No. 85-6 at -0278.

Recognizing that some passholders may have new park visitation habits in the pandemic, when WDPR reopened and introduced the reservation system among other safety programs, it gave passholders the option to cancel their pass and receive a pro rata refund (or have monthly payments stop); otherwise WDPR extended their passes for four months to account for when WDW was closed plus an additional complimentary month.  ECF No. 85-6 at -0279; Ex. 3 at -1426.  WDPR allowed passholders to preview the parks before opening to the general public, letting them experience firsthand the new safety measures, including the reservation system.  ECF No. 85-3 at -0276.  It notified passholders that, if they wanted to opt out of their passes, they had until August 11, 2020, to do so.  ECF No. 85-6 at -0279.  If passholders opted out, they received a prorated refund dated back to the March 2020 closure (so got the exploratory period from mid-July to mid-August for free).  Ex. 1 at 225:17-19.  Notwithstanding the August 11 decision date, WDPR "continued to offer opt-outs through the end of the year."  *Id.* at 234:15, 235:12-13.  Around 15-20 percent of Platinum Pass holders opted out.  *See*

*id.* at 236:22-25.  During this time, WDPR paused the sale of new annual passes and only permitted renewals by current passholders to avoid over-saturation in this reduced capacity context.  *See id.* at 115:24-116:16.

To meet COVID safety restrictions when implementing the reservation system, WDPR had to first set an upper limit on total daily reservations.  Ex. 1 at 65:16-23.  Then, within that upper limit, WDPR had to identify the number of reservations that would be available to ticketholders and annual passholders, taking into account that "one of [WDPR's] primary considerations" was "opening fairly," including to "fairly distribute across those different audiences."  *Id.* at 73:19-74:14, 148:9-149:20.  When WDPR developed the reservation system, it planned the baseline number of passholder reservations based on the visitation rate of passholders at comparable times in prior years, while also considering pandemic safety precautions.  *See id.*; Ex. 2 at Interrogatory 8.

Plaintiffs complain in this case of a natural and practical reality of these precautions.  Because reservations are separately allocated to groups of guests (*e.g.*, annual passholders or ticketholders) and it is impossible to perfectly predict future patronage, it is possible for all reservations allocated to one group to be booked out even while reservations are still available to other groups.[2]  *See* Ex. 1 at 66:22-67:3.  But it has been exceedingly rare for all reservations allotted to annual passholders to end up fully booked.  Between July 11, 2020 and September 7,

---

[2] Reservation availability can fluctuate in the time period leading up to a visitation date, as guests make or cancel reservations or allocations are increased.  Ex. 1 at 278:16-22.

2022,[3] there were only *seven days* on which all reservations allocated to annual passholders ended up fully booked for all WDW theme parks, *see* Declaration of Nicholas Bagnasco ("Bagnasco Decl.") ¶ 4, in contrast to *24 days* fully booked for all WDW theme parks to ticketholders, *see* ECF No. 85 ¶ 22.

### C.  Plaintiffs Erica Kelly and Marilyn Paone

Kelly and Paone both had activated Platinum Passes in March 2020.  *See* Ex. 4 at 18:21-23; Ex. 5 at 37:5-9.  Although they are longtime WDW annual passholders, Plaintiffs could not recall anything about the terms and conditions governing their passes; however, neither testified that she had not seen the terms and conditions or that she had not agreed to them.  Ex. 4 at 29:16-18, 29:23-30:3, 51:10-25; Ex. 5 at 29:4-7, 30:2-5.  Both received and understood communications from WDPR in 2020 informing them about the reservation requirement and the option to opt out.  Ex. 4 at 67:24-69:3, 74:17-75:10; Ex. 5 at 69:14-16, 79:22-80:7; Ex. 6 at RFAs 1-3; Ex. 7 at RFAs 1-3.  But neither opted out.  Ex. 6 at RFAs 1-3; Ex. 7 at RFAs 1-3.  Instead, Plaintiffs kept their existing passes and then renewed them under the reservation system.  Ex. 4 at 79:16-80:6; Ex. 5 at 28:4-12.[4]

Plaintiffs visited WDW repeatedly during the putative class period with their Platinum Passes, aware of and under the modified terms: Paone 147 times and

---

[3] Plaintiffs seek to certify a class of all persons who had an activated Platinum Pass at any time between July 11, 2020, through September 7, 2021.  ECF No. 82 at 7.  An annual pass activated on the last date of September 7, 2021, would have been eligible to make reservations using that pass through September 7, 2022.

[4] Paone renewed her Platinum Pass on September 3, 2020 (Ex. 9 at -0773) and September 2, 2021 (Ex. 9 at -0777).  Kelly renewed her Platinum Pass on November 5, 2020 (Ex. 8 at -0739).

Kelly 31 times.  *See* Ex. 4 at 20:8-14; Ex. 5 at 25:14-16, 82:12-83:9; Ex. 8 at -0738, -0740; Ex. 9 at -0771, -0774-0776, and -0778-0781.  That included visits on dates when lower tier passes, like the Gold Pass, were blocked out and on one of the few dates that ultimately booked out to annual passholders.[5]

## LEGAL STANDARD

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  The nonmoving party maintains the burden of showing sufficient evidence "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* In opposing a motion for summary judgment, a party must "provide specific facts from the record" and cannot rely on "conclusory allegations."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  "If there is not sufficient evidence for a jury to find for the non-moving party, 'or if the evidence is merely colorable,' or if it 'is not significantly probative,' then summary judgment is appropriate."  *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022).

---

[5] Plaintiffs visited on lower tier passes' blockout dates December 18 and 31, 2020 and January 1-2 and April 2, 6-7, 2021 (Paone) and June 5-6, 2021 (Kelly), *see* ECF No. 85-5; Paone visited on June 29, 2022, a date ultimately fully booked to annual passholders, *see* Bagnasco Decl ¶ 4.

**ARGUMENT**

Plaintiffs' core claim is that the reservation system imposed "blockout dates" by "refusing to allow Platinum Pass holders the ability to make park reservations even when park reservations were available to other categories of pass holders and ticket holders." ECF No. 50 (TAC) ¶ 67. With discovery now complete, all five of Plaintiffs' causes of action fail at summary judgment.

## I.   There Is No Evidence Putting Into Genuine Dispute Whether WDPR Breached An Express Or Implied Contractual Promise

Plaintiffs bring claims for breach of implied contract (Count I) and, in the alternative, for breach of express contract (Count II). "Under Florida law, there are three elements to a breach of contract claim: (1) the existence of a contract; (2) a material breach; and (3) damages resulting from the breach." *Ulloa v. Fancy Farms, Inc.*, 762 F. App'x 859, 867 (11th Cir. 2019). "Florida courts use breach of contract analysis to evaluate claims of breach of contract implied in fact." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012). The contractual promise alleged for both claims is "no blockout dates." TAC ¶¶ 65, 80. Summary judgment should be entered for WDPR on both contract claims for three independent reasons: (A) the undisputed facts show that WDPR was entitled to make changes to park access by annual passholders; (B) the undisputed facts show that Plaintiffs ratified the changes made; and (C) Plaintiffs fail to raise a genuine dispute about whether the changes constituted "blockout dates."[6]

---

[6] WDPR does not move for summary judgment on whether "no blockout dates" was a contractual term at all, though it was not. WDPR reserves all rights to contest this element at trial, if any.

### A.     WDPR Was Contractually Permitted To Make Changes

The undisputed facts show that WDPR was entitled to modify the terms of annual passholders' access to the WDW theme parks.  The terms and conditions that governed Plaintiffs' annual passes in July 2020 provided that the "[p]arks, attractions or entertainment may … change or be discontinued without notice and without liability," and that the terms of access "are subject to change."  ECF No. 85-2 at -1446.  WDPR's websites explained that pass entitlements are "subject to change without notice."  ECF No. 50-10 at 2, 4.  Prompted by the unprecedented pandemic, WDPR acted pursuant to these provisions and closed the parks for months and, upon reopening, implemented the reservation system.  After those changes were made for passes active when the pandemic hit, many passholders, including Plaintiffs, activated or renewed into passes under the revised terms.

Courts routinely find in favor of a contracting party taking similar actions pursuant to similar reservations of rights.  *See, e.g.*, *Dixon v. Univ. of Miami*, 75 F.4th 1204, 1208-1209 (11th Cir. 2023) (finding that university's "express right to alter or amend" student policies and procedures permitted transition to remote learning during pandemic, even if students had contractual right to in-person education); *Barnes v. Diamond Aircraft Indus., Inc.*, 499 F. Supp. 2d 1311, 1317-1318 (S.D. Fla. 2007) (no breach from price modification where "price and specifications [are] subject to change without notice"); *Hancock v. Am. Tel. & Tel. Co.*, 804 F. Supp. 2d 1196, 1203 n.16 (W.D. Okla. 2011) (under Florida law, upholding a contractual provision indicating that "[terms] may be updated or

changed from time to time"), *aff'd*, 701 F.3d 1248 (10th Cir. 2012).  Summary judgment should be entered for WDPR on the contract claims on this basis alone.

In response to this clear language barring their contract claims, Plaintiffs alleged "[u]pon information and belief" that they "did not sign nor agree to any express contractual terms upon purchasing a Platinum Pass."  TAC ¶¶ 57-58. Setting aside the oddity of pleading one's own conduct "on information and belief," at this stage there is no genuine dispute over whether Plaintiffs agreed to the terms and conditions.  The record shows that the terms and conditions applied to all Platinum Pass holders and that all passholders, including Plaintiffs, agreed to them as part of their purchase.  *See* Ex. 1 at 63:5-9, 238:18-239:8.  Plaintiffs offered no testimony to the contrary—neither testified that she did not agree to the terms and conditions.   Ex. 4  at 29:16-18,  29:23-30:3,  51:10-25;  Ex. 5  at 29:4-7,  30:2-5. Plaintiffs offer no evidence that they were not bound by the terms and conditions.

Plaintiffs also alleged that WDPR's right to modify was "unconscionable." TAC ¶ 82.  "To prevail in claiming that a contract or a contractual provision is unconscionable, a party must establish both procedural unconscionability and substantive unconscionability." *SHEDDF2-FL3, LLC v. Penthouse S., LLC*, 314 So. 3d 403, 409 (Fla. Dist. Ct. App. 2020).  "Florida courts apply the doctrine of unconscionability 'with great caution.'"  *Lambert v. Signature Healthcare, LLC*, 2022 WL 2571959, at *4 (11th Cir. July 8, 2022).  There is no evidence from which a reasonable factfinder could find procedural or substantive unconscionability.

The only ground Plaintiffs have offered to find procedural unconscionability

is that passholders did not individually negotiate the terms.  But "'the presence of an adhesion contract alone does not'" establish "'procedural unconscionability.'" *Howse v. DirecTV, LLC*, 221 F. Supp. 3d 1339, 1344 (M.D. Fla. 2016); *see also Vaughan v. Emerald Coast RV Ctr., LLC*, 2019 WL 13227254, at *6-7 (M.D. Fla. Mar. 7, 2019) (not enough that contract "was non-negotiable"); *Solis v. Am. Express Nat'l Bank,* 2023 WL 4474322, at *3 (M.D. Fla. July 11, 2023) ("elect[ing] to be bound by an adhesion contract" does not "amount to procedural unconscionability"), *adopted by* 2023 WL 4831307 (M.D. Fla. July 28, 2023).

As for substantive unconscionability, the Eleventh Circuit has found "changes-to-agreement" clauses like the one here are not "substantively unconscionable." *Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1234 n.11 (11th Cir. 2012).  In any event, there is no evidence in the record to put into genuine dispute whether WDPR's right to change pass terms was "'so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice.'" *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 284 (Fla. Dist. Ct. App. 2003).  Plaintiffs themselves—and tens of thousands of other Platinum Pass holders—"view[ed] the ensuing result" of the reservation system not with "a profound sense of injustice," *id.*, but by keeping their passes, not opting out, and *renewing* multiple times.  There is therefore no genuine dispute that these terms were not substantively unconscionable.

## B.    Plaintiffs Ratified The Changes To Their Passes

Under Florida law, a party ratifies an amended agreement where she has

"'full knowledge of all material facts and circumstances relating to the unauthorized act or transaction at the time of the ratification.'" *Rodriguez v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 11880987, at *3 (S.D. Fla. May 7, 2014); *Nowlin v. Nationstar Mortg., LLC*, 193 So. 3d 1043, 1046 (Fla. Dist. Ct. App. 2016). Just so here.  WDPR provided passholders notice of the reservation system.  *See* ECF No. 85-4 at -0272; ECF No. 85-3 at -0275; ECF No. 85-6 at -0278.  Plaintiffs were aware of the modifications to their passes, and continued to accept the benefits of them as modified.  *See* Ex. 4 at 20:8-14; Ex. 5 at 25:14-16, 82:12-83:9.

Plaintiffs further showed their intent to ratify by declining to opt out.  *See, e.g.*, *Devoux v. Wise*, 2014 WL 1457520, at *6 (M.D. Fla. Apr. 15, 2014) (A party "'with knowledge of the facts entitling him to rescission of a contract ... ratifies the same'" by "'any acts of recognition of the contract ... or any conduct inconsistent with an intention of avoiding it.'"); *see generally Frankenmuth Mut. Ins. Co. v. Magaha*, 769 So. 2d 1012, 1022 (Fla. 2000).  Passholders were notified of the opt-out option.  *See* ECF No. 85-6 at -0279; Ex. 3 at -1426.  WDPR accepted opt-outs through the end of 2020, during which passholders experienced the new system.  Ex. 1 at 234:15, 235:12-13.  As a result, at least 15-20 percent of Platinum Pass holders opted out.  *See id.* 236:22-25.

There is no dispute Plaintiffs knowingly declined to opt out.  Both Plaintiffs acknowledge that they were aware of their option to opt out and affirmatively decided not to.  Ex. 4 at 67:24-69:3, 74:17-75:10; Ex. 5 at 69:14-16, 79:22-80:7; Ex. 6 at RFAs 1-3; Ex. 7 at RFAs 1-3.  Plaintiffs then renewed their Platinum Passes

under the reservation system (Paone twice). Ex. 4 at 79:16-80:6; Ex. 5 at 28:4-12. During this time, Plaintiffs both continued to accept the benefits of their (existing or renewed) passes by visiting the parks—a lot: Paone on 147 occasions, Kelly on 31. *See* Ex. 8 at -0738, -0740; Ex. 9 at -0771, -0774-0776, and -0778-0781.

Once someone ratifies new terms, they cannot sue for breach. *See Rodriguez*, 2014 WL 11880987, at *5. It is beyond genuine dispute that Plaintiffs "accept[ed] the benefits" of the modified annual pass access when they chose not to opt out, instead renewing and each visiting the parks *dozens* of times with their modified passes. *See Pretka v. Kolter City Plaza II, Inc.*, 550 F. App'x 830, 832 n.1 (11th Cir. 2013) (rejecting plaintiffs' breach of contract claim after plaintiffs chose not to cancel contract in response to defendant's modification); *Americana Assocs., Ltd. v. Whud Real Est. Ltd. P'ship*, 715 So. 2d 955 (Fla. Dist. Ct. App. 1998); *Sea-Land Serv., Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1262 (S.D. Fla. 1999), *aff'd*, 231 F.3d 848 (11th Cir. 2000); *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1045 n.4 (11th Cir. 1987). This entitles WDPR to summary judgment.

## C. There Is No Genuine Dispute Of Fact About Whether WDPR Imposed "Blockout Dates"

Finally, WDPR is independently entitled to summary judgment on the contract claims because, with discovery closed, there is no evidence to support the allegation that "Disney effectively subjected Platinum Passes to Blockout Dates" by requiring reservations. TAC ¶ 17. Plaintiffs alleged that "Blockout Dates are pre-designated days Disney closes off the parks to certain annual pass holders due to high park attendance or for other reasons that only Disney controls," and that

"Annual pass holders whose passes have Blockout Dates are not eligible to use their annual pass to enter the Florida parks on certain days of the year." TAC ¶ 7. They evidently suspected, and based this case on the assumption, that "there were one or more days [when] no Platinum Pass holders were permitted by Defendant to make a park reservation with their Platinum Pass." Ex. 12 at RFA 11.

Discovery has disproved their suspicions beyond dispute. There were no such dates for the Platinum Pass under the reservation system. It is an undisputed fact that Platinum Pass holders made reservations and visited WDW on every date of the putative class period that WDW was open. Bagnasco Decl. ¶ 5; ECF No. 85 ¶ 22. There is no date on the calendar that was a "blockout date[] for all activated Platinum Passes," ECF No. 82 at 11—not Christmas Day, not New Year's Eve, not the Fourth of July, not any date. Platinum Pass holders were "eligible to use their annual pass" on every day of the year, and they did. TAC ¶ 7. WDPR did not "pre-designate[]" "certain days of the year" on which Platinum Pass holders were "not eligible" to enter the parks. *Id.* Discovery has proved that under the reservation system, "Platinum Pass holders were permitted to go to all four Florida Disney parks 365 days a year without any Blockout Dates"—they quite literally did so. *Id.* ¶ 9. In contrast, Gold Passes had blockout dates on which they were categorically ineligible for reservations and park visitation—on average 30 dates per year—and so *no one* used a Gold Pass to visit the parks on those dates. ECF No. 85-5. That Platinum Pass holders visited on every date under the reservation system proves beyond dispute that those passes continued to have "no blockout dates."

Plaintiffs try to avoid this undisputed fact by abandoning their definition of "Blockout Date" that they pleaded.  Instead they proffer a new, gerrymandered meaning: a date for which annual-passholder reservations were even temporarily fully booked—including by thousands of people using Platinum Passes—at the time Plaintiffs tried to make reservations.  At the same time, they strategically avoid claiming that the dates when WDW was closed due to COVID-19 were blockout dates, or dates the parks hit allocated capacity were blockout dates.  It is only the dates that they personally were inconvenienced by even temporary reservation bookouts that are their "blockout dates" now.  This is a transparent effort to fit a square peg (reservation bookouts) into a round hole (blockout dates), to make a fleeting inconvenience into an alleged breach of contract.

Plaintiffs back up this engineered, atextual interpretation of "blockout dates" with nothing—no evidence or support.  When asked "what's the basis for [her] understanding of a block-out date," Kelly, for example, answered:  "I don't know.  Just it's always been that way as it's—like I said, I've had a pass for many years and that's when I have a day that says no block-out dates and I—okay."  Ex. 4 at 26:21-27:1.  With undisputed evidence there were no "blockout dates" for Platinum Passes as Plaintiffs' own pleadings defined the term, "conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition" cannot defeat summary judgment.  *BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 659 (11th Cir. 2016); *SureTec Ins. Co. v. Nat'l Concrete Structures, Inc.*, 2013 WL 394873, at *6 (S.D. Fla. Jan. 31, 2013).

## II.  The Court Should Grant WDPR Summary Judgment On Plaintiffs' Implied Covenant Claim

In Count III, Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing (GFFD).  Under Florida law, the implied covenant of GFFD "is a part of every contract," but "the rights [it] confer[s] … are limited." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315-1316 (11th Cir. 1999).  Plaintiffs' implied covenant claim fails as a matter of law for three independent reasons: (A) it is duplicative of their contract claims; (B) it contradicts the actual contract terms; and (C) there is no genuine dispute over whether WDPR acted in good faith.

### A.  The Implied Covenant Claim Fails As A Matter Of Law Because It Is Duplicative Of The Contract Claims

Where a "breach of covenant claim … is redundant of [a] breach of contract claim," "the district court properly grant[s] summary judgment for [the defendant] on this claim." *Cutler Bay Apartments, LLC v. Bank of Am., N.A.*, 805 F. App'x 996, 1004 (11th Cir. 2020).  There is no daylight between Plaintiffs' GFFD claim (not pleaded in the alternative) and their contract claims—both rely on the exact same allegation and evidence (or lack thereof) that the reservation system created blockout dates for the Platinum Pass.  Where "[t]here is no difference between the factual underpinnings of [a] breach of contract claim and [the] claim for breach of the implied covenant," it fails as a matter of law.  *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1321 (M.D. Fla. 2000); *Bradman v. Mental Health Network, Inc.*, 2008 WL 5110525, at *3 (S.D. Fla. Dec. 2, 2008) (granting summary judgment on GFFD claim that "duplicates the allegations supporting the breach of contract claim").

**B.      The Implied Covenant Claim Fails As A Matter Of Law Because It Contradicts The Contract Terms**

Independently, "the implied covenant of good faith cannot apply to contradict the express terms of a contract." *Barnes v. Diamond Aircraft Indus., Inc.*, 499 F. Supp. 2d 1311, 1320 (S.D. Fla. 2007); *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1359 (S.D. Fla. 2007) ("'[T]here can be no breach of the implied promise [of GFFD] where the contract expressly permits the actions being challenged.'"), *aff'd*, 308 F. App'x 389 (11th Cir. 2009). Because the terms allowed WDPR to change park access, Plaintiffs' claim fails as a matter of law.

**C.      The Undisputed Facts Show WDPR Acted In Good Faith**

Finally, summary judgment should be granted to WDPR on the implied covenant claim because Plaintiffs fail to put into genuine dispute whether WDPR acted in good faith. Under Florida law, "the covenant of [GFFD] imposes a duty ... to act in a commercially reasonable manner that satisfies the reasonable expectations of the contracting parties." *Martorella v. Deutsche Bank Nat'l Tr. Co.*, 931 F. Supp. 2d 1218, 1225-1226 (S.D. Fla. 2013). Courts therefore grant summary judgment for defendants when the undisputed evidence shows that they exhibited "commercially reasonable" behavior. *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 655 (Fla. Dist. Ct. App. 2004); *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. Dist. Ct. App. 2000) ("Unless no reasonable party in the position of the [defendant] would have made the same ... decision the [defendant] made, it seems unlikely [it] would violate the covenant ....").

The undisputed evidence demonstrates that WDPR's behavior was

commercially reasonable.  WDPR instituted the reservation system in response to the unprecedented exigencies of the COVID-19 pandemic.  *See* ECF No. 85-4 at -0272.  The record shows that the decision to implement the reservation system, and how to implement it, were motivated by commercially reasonable priorities like safety and guest satisfaction, in addition to financial viability.  *See, e.g.*, *id.*; Ex. 1 at 68:12-15, 186:17-19.   Setting reservation allocations based on past visitation propensity of passholders, Ex. 1 at 149:14-20; Ex. 2 at Interrogatory 8, is an indisputably reasonable measure, *see, e.g.*, *In matter of Shree Meldikrupa Inc.*, 547 B.R. 862, 874 (Bankr. S.D. Ga. 2016) (determining a reasonable expectation of business profits by "comparing ... historical financial information and projected cash flows"); *TRA Farms, Inc. v. Syngenta Seeds, Inc.*, 2014 WL 3844827, at *1 n.4 (N.D. Fla. Apr. 4, 2014).  There is no evidence that WDPR's actions were not commercially reasonable and in good faith, warranting summary judgment.

## III.   The Court Should Grant WDPR Summary Judgment On The Florida Deceptive And Unfair Trade Practices (FDUTPA) Claim

To succeed on an FDUTPA claim (Count V), a plaintiff must show: "'(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008).  Plaintiffs premise their FDUTPA claim on WDPR "advertising the Platinum Pass with 'no blockout dates,'" contending that the advertisement was deceptive.  ECF No. 82 at 14-15.  For two distinct reasons, this does not constitute a "deceptive act or unfair practice" under the undisputed facts, so Plaintiffs' FDUTPA claim fails.

### A.     A Breach Of Contract Does Not Create An FDUPTA Claim

Plaintiffs' FDUTPA claim is premised on the fact that WDPR deceptively advertised "no blockout dates."  ECF No. 82 at 14-15.  At the same time, Plaintiffs contend that this advertised feature constituted an express or implied contractual promise.  *See* ECF No. 58 at 11; ECF No. 82 at 16.  That contention is necessary to their contract claims, but is fatal to their FDUTPA claim.  FDUTPA claims cannot proceed when the alleged unfair practice is identical to the action allegedly breaching a contract.  *See Rebman v. Follett Higher Educ. Grp., Inc.*, 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008) (granting summary judgment on FDUTPA claim in a putative consumer class action that "challenge[d] the act of breaching the Agreement as unfair or deceptive"); *see also Fong Kai Bus. Grp. Co. v. Shade Saver, Inc.*, 2019 WL 12304385, at *6 (M.D. Fla. Apr. 9, 2019) (dismissing FDUTPA claim as duplicative of breach of contract claim); *Stubblefield v. Follett Higher Educ. Grp., Inc.*, 2010 WL 2025996, at *3 (M.D. Fla. May 20, 2010) (same).  Either the advertised feature "no blockout dates" was not a contractual promise and Plaintiffs' contract claims fail, or it was and their FDUTPA claim fails.

### B.     There Is No Evidence Of Deceptive Or Unfair Conduct

Plaintiffs are entirely without evidence that WDPR's advertisement of the Platinum Pass constituted deceptive or unfair conduct.  "To show the existence of a deceptive act or unfair practice, a plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'"  *McCoy v. Nestle USA, Inc.*, 2024 WL 399480, at *2 (N.D. Fla. Feb. 1, 2024).  "This

standard requires showing 'probable, not possible, deception.'" *NBIS Constr. & Transp. Servs., Inc. v. Liebherr-America, Inc.*, 2021 WL 1329266, at *6 (M.D. Fla. Mar. 16, 2021) ("[A]n unfair practice is one that … 'is immoral, unethical, oppressive, unscrupulous or substantially injurious.'"), *adopted by* 2021 WL 3009589 (M.D. Fla. Apr. 13, 2021).  "[A]n unfair practice is one which causes substantial injury to a cons*umer which the consumer could not have reasonably avoided* and which is not outweighed by countervailing benefits."  *Harrod v. Express Scripts, Inc.*, 2019 WL 8273650, at *4 (M.D. Fla. Aug. 16, 2019).

With discovery now complete, no reasonable juror could conclude that WDPR's advertisement of the Platinum Pass was deceptive or unfair.  Plaintiffs contend that WDPR advertised the Platinum Pass as having "no blockout dates," and contravened that advertised feature by implementing the reservation system. But it is not "probable" that a reasonable consumer would have been deceived in this situation.  *NBIS Constr.*, 2021 WL 1329266, at *6.  WDPR implemented the reservation system amid a once-in-a-century pandemic as part of its efforts to safely reopen its theme parks—a far cry from an "immoral, unethical, oppressive, unscrupulous, or substantially injurious" practice.  *Id.*  It is undisputed that WDPR gave annual passholders notice of the coming reservation system and several off ramps from it, including the option to opt out for a pro rata refund after experiencing the new system.  ECF No. 85-6 at -0279.  Under these circumstances, no reasonably objective consumer would have been deceived.  *See, e.g.*, *Jones v. TT of Longwood, Inc.*, 2007 WL 2298020, at *7 (M.D. Fla. Aug. 7, 2020).  Nor can

Plaintiffs show their supposed injury was one they "could not have reasonably avoided" when they could have chosen to opt out and, later, not to renew.  *Harrod*, 2019 WL 8273650, at \*4.  Because Plaintiffs cannot show that WDPR employed a deceptive or unfair practice, their FDUTPA claim fails as a matter of law.

In an attempt to avoid the many, now undisputed facts proving WDPR did not act deceptively or unfairly, Plaintiffs alleged that they interpreted the reservation system as a "temporary safety precaution."  TAC ¶ 25.  But, when pressed in depositions to identify a representation from WDPR in which the reservation system was promised to be temporary, Plaintiffs could not do so.  Ex. 4 at 57:9-63:4; Ex. 5 at 60:17-63:25.  No such statement exists.  Plaintiffs could only point to statements that identified the reservation system as one part of WDPR's broader pandemic-era reopening plan—which it indisputably was—and offer their baseless speculation that it would be temporary.  *Id.*  But when asked to admit that the reservation system was not deceptive *when implemented* in 2020, or to identify when Plaintiffs contend that it should have been removed, Plaintiffs demurred— and claimed that WDPR should not have implemented the reservation system at all.  Ex. 5 at 64:17-20, 66:13-16, 68:19-69:1; Exs. 10-11 at Interrogatory 12.  With no representation or reasonable expectation that it would be temporary, and no facts showing when or why it should have been eliminated even if so, Plaintiffs fail to put into genuine dispute that any conduct was deceptive or unfair.

## IV.    Summary Judgment Is Warranted On The Contract Claims And FDUTPA Claim Because There Is No Genuine Dispute Over Whether Plaintiffs Received The Benefit Of Their Bargain

Plaintiffs' contract claims (Counts I, II, III) and FDUTPA claim (Count V) require them to prove damages—that they did not receive the benefit of their bargain with WDPR.  *See, e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1152, 1187 (S.D. Fla. 2021) ("Under a benefit-of-the-bargain theory, damages are generally equal to the difference in value between the product in the condition in which it was delivered versus its value if it were delivered in the condition according to the parties' contract."); *Plain Bay Sales, LLC v. Gallaher*, 2022 WL 409577, at *19 (S.D. Fla. Feb. 10, 2022) (FDUTPA).[7]  Where there is no evidence of a difference between the value of what was delivered and what should have been delivered, such claims fail.  *See, e.g.*, *Boigris v. EWC P&T, LLC*, 2020 WL 1695462, at *9 (S.D. Fla. Feb. 25, 2020), *aff'd*, 7 F.4th 1079 (11th Cir. 2021).

Plaintiffs lack any evidence that the value of the Platinum Passes that were delivered was less than what should have been delivered.  Plaintiffs both held Platinum Passes as of March 2020 when WDW closed.  They do not claim those Platinum Passes delivered less value than they bargained for *before* the reservation system.  There is no evidence in the record—none—that the reservation system alone diminished the value of their passes by a material amount.  On the contrary,

---

[7] "While the Florida DUTPA cases do not use the phrase 'benefit of the bargain' in describing this damages formula, the two are clearly synonymous: the value of the product as promised minus the value of the product delivered."  *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453 (5th Cir. 2001).

when given the opportunity, Plaintiffs and tens of thousands of other passholders chose not to opt out of their passes under the reservation system and get their money back. Ex. 1 at 235:10-18; ECF No. 85 ¶ 23. Many renewed into Platinum Passes—at the same price—still under the reservation system, including Kelly and Paone. *See* ECF No. 85 ¶ 23; Exs. 6-7 at RFA 3. Plaintiffs then visited the parks using those passes dozens of times. Ex. 8 at -0738, -0740; Ex. 9 at -0771, -0774-0776, and -0778-0781. They visited, repeatedly, on lower tier passes' blockout dates, of which even the next highest tier Gold Pass had around 30 per year. *See* ECF No. 85-5. Paone visited on one of the few dates that ultimately booked out to annual passholders, June 29, 2022. Bagnasco Decl. ¶ 4. These facts show that Platinum Passes with a reservation requirement are not less valuable than passes without a reservation requirement; no evidence puts this fact into genuine dispute.

Nor does any evidence show that the availability of reservations to Platinum Pass holders lessened the value of their passes. During the first year of the reservation system—the time period relevant to a Platinum Pass activated pre-pandemic—there was not a single day on which all reservations allocated to annual passholders ended up fully booked for all WDW theme parks. Bagnasco Decl. ¶ 4; ECF No. 85 ¶ 22. There were only seven such dates before September 7, 2022—the last date a Platinum Pass within the putative class could have been active—and all occurred in February 2022 or later, so were only experienced by passholders who renewed under the reservation system and so got exactly the value they expected. Bagnasco Decl. ¶ 5; ECF No. 85 ¶ 22. Again, these facts demonstrate

that putative classmember Platinum Pass holders received the benefit of their bargain, and there is no countervailing evidence to dispute it.

## V.  The Court Should Grant WDPR Summary Judgment On The Unjust Enrichment Claim

Plaintiffs' Count IV is for unjust enrichment.  That claim fails as a matter of law because (A) it cannot proceed where there is a contract and (B) Plaintiffs fail to raise a genuine dispute over whether WDPR acted "inequitably."  *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d 1241, 1261 (S.D. Fla. 2017).

### A.  The Unjust Enrichment Claim Fails As A Matter Of Law Because There Is An Implied Or Express Contract

"[U]njust enrichment is concerned solely with enrichments that are unjust independently of wrongs and contracts."  *Flint v. ABB, Inc.*, 337 F.3d 1326, 1330 n.2 (11th Cir. 2003).  Only "[i]f there is no *express or implied-in-fact* contract" may a party claim unjust enrichment.  *Cape, LLC v. Och-Ziff Real Est. Acquisitions LP*, 370 So. 3d 1010, 1016 (Fla. Dist. Ct. App. 2023) (emphasis added).  With discovery closed, there is no dispute of fact that either an express or implied contract governs.  *Supra* Section I.  Indeed, the undisputed facts show that it is an express contract— the terms and conditions—that govern.  *Supra* Section I.A.  Summary judgment is thus appropriate on the unjust enrichment claim.  *See, e.g.*, *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1274 (S.D. Fla. 2015) (granting summary judgment).

### B.  There Is No Evidence Of Unjust Enrichment

"When a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails.'"  *Baptista v. JPMorgan*

*Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.3 (11th Cir. 2011).  That is the case here. Again, Plaintiffs visited WDW dozens of times during the putative class period— more than "adequate consideration" because of which Plaintiffs' "unjust enrichment claim fails as a matter of law." *Id.*; *see also Pincus v. Am. Traffic Sols., Inc.*, 25 F.4th 1339, 1341 (11th Cir. 2022); *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) (rejecting unjust enrichment where plaintiffs "derived a substantial benefit").

Furthermore, Plaintiffs offer no evidence from which a reasonable jury could conclude that WDPR engaged in inequitable conduct, for the same reasons they lack evidence of bad faith (Section II) or unfair or deceptive conduct (Section III). Summary judgment is warranted on this claim for those same reasons.

## CONCLUSION

For these reasons, the Court should grant WDPR summary judgment.

DATED: March 5, 2024                          Respectfully submitted,

Dennis P. Waggoner                            */s/ Alan Schoenfeld*
(Fla. Bar No. 509426)                         Alan Schoenfeld (*pro hac vice*)
dennis.waggoner@hwhlaw.com                    Ryan M. Chabot (*pro hac vice*)
Joshua C. Webb                                WILMER CUTLER PICKERING
(Fla. Bar No. 051679)                            HALE AND DORR LLP
Joshua.webb@hwhlaw.com                        7 World Trade Center
HILL, WARD & HENDERSON, P.A.                  250 Greenwich Street
101 E. Kennedy Blvd., Suite 3700             New York, NY 10007
Tampa, FL 33602                               Tel: (212) 230-8800
Tel: (813) 221-3900                           Fax: (212) 230-8888
Fax: (813) 221-2900

*Attorneys for Defendant Walt Disney Parks and Resorts U.S., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2024, I caused to be electronically filed the foregoing document using the CM/ECF system, which will serve a notice of electronic filing to all counsel of record.

*/s/ Alan E. Schoenfeld*
Alan E. Schoenfeld